**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
John A. Yanchunis (Pro Hac Vice Forthcoming)
jyanchunis@ForThePeople.com
Ryan J. McGee (Pro Hac Vice Forthcoming)
rmcgee@ForThePeople.com
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: 813/223-5505
813/223-5402 (fax)

Jean S. Martin (Pro Hac Vice Forthcoming)
jeanmartin@ForThePeople.com
2018 Eastwood Road Suite 25
Wilmington, NC 28403
Tel: (813) 559-4908
Fax: (813) 222-4795

**CLAYEO C. ARNOLD, APLC**
Clayeo C. Arnold, California SBN 65070
carnold@justice4you.com
Joshua H. Watson, California SBN 238058
jwatson@justice4you.com
111 W. Ocean Blvd, Fourth Floor
Long Beach, CA 90802
Tel: (562) 216-8270; (916) 777-7777
F: (916) 924-1829

*Attorneys for Plaintiff*
*Debbie Ray and the Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| **DEBBIE RAY on behalf of herself and all others similarly situated,**<br><br>**Plaintiff**<br><br>**v.**<br><br>**FIRST AMERICAN FINANCIAL CORP,**<br><br>**Defendant.** | **CASE NO.:**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Debbie Ray ("Plaintiff"), individually and on behalf of those similarly situated, brings this class action lawsuit against First American Financial Corporation ("First American" or "Defendant") based upon personal knowledge as to herself, and on information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiff brings this class action case against Defendant First American for failing to: (1) to secure and safeguard its customers' sensitive personally identifiable information ("PII") along with other customer information (collectively, "Customer Data") which First American collected in conjunction with mortgage related transactions; (2) provide timely, accurate and adequate notice to Plaintiff and other Class Members that their PII had been illegally exposed; and (3) identify precisely the types of PII that were exposed and for how long they had been exposed. ("Data Breach").

2.      First American is the largest title insurance provider in the nation. It also provides home insurance and warranties to homeowners in addition to a variety of services for mortgage lenders in closing and servicing real-estate transactions. In conjunction with these services, First American requires, and receives, an enormous amount of personally identifiable information from consumers on whose behalf it is performing services including, but not limited to, their names, addresses, Social Security numbers, driver's license numbers, dates of birth and bank account information, among other PII.

3.      On May 24, 2019, Brian Krebs, a leading cybersecurity expert revealed that First American's website (www.firstam.com) was leaking "tens if not hundreds of millions of records," and that "anyone who knew the URL for a valid document at the Web site could view other documents just by modifying a single digit in the link."[1]

---

[1] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/

CLASS ACTION COMPLAINT

4.      Indeed, First American's website was actively exposing personal data contained in 885 million files dating back to 2003. "Many of the exposed files are records of wire transactions with bank account numbers and other information from home or property buyers and sellers . . . The title insurance agency collects all kinds of documents from both the buyer and seller, including Social Security numbers, drivers' licenses, account statements, and even internal corporate documents if you're a small business. You give them all kinds of private information and you expect that to stay private." *Id.*

5.      Shortly after Krebs exposed the data leak, First American purportedly disabled the site that served the records. They did not, however, provide notice to affected consumers, nor provide any detailed information relating to the Breach including the nature and extent of the exposure, the types of information that was exposed, and for how long it had been unprotected.

6.      Despite the gravity of the Breach, First American stated only that, "[w]e are currently evaluating what effect, if any, this had on the security of customer information. We will have no further comment until our internal review is completed."

7.      As noted by Krebs, "the information exposed by First American would be a virtual gold mine for phishers and scammers involved in so-called Business Email Compromise ("BEC") scams, which often impersonate real estate agents, closing agencies, title and escrow firms in a bid to trick property buyers into wiring funds to fraudsters…. Armed with a single link to a First American document, BEC scammers would have an endless supply of very convincing phishing templates to use. A database like this also would give fraudsters a constant feed of new information about upcoming real estate financial transactions — including the email addresses, names and phone numbers of the closing agents and buyers." *Id.*

8.      Poignantly, Krebs concludes, "these types of data exposures are some of the most common yet preventable." *Id.*

CLASS ACTION COMPLAINT

9.    The careless nature of First American's data leak included, among other things: (1) the company's use of database record identifiers in the webpage addresses for specific private documents containing PII, and (2) a failure to set security protocols such that users of the system could only access those documents associated with their own accounts.

10.    For many years, web applications, including the First American web application at issue in this Complaint, have operated on a "stack" of technologies in which layers or systems interact to provide functionality.  Information flows upwards and downwards through the layers of the stack.  Together, the layers collect information, format it, transmit it, and process it as data repeatedly moves between web servers hosting the web application and web browsers on the computers/devices of customers and/or end-users. [2]

11.    In order to provide even rudimentary security for any web application, it is necessary to consider how movement of information between the layers of the stack affect each layer.  This is because what appears as innocuous information in one layer of the stack may operate as a command or material parameter in another layer of the stack.  Reasonable web application developers take care to manage such interactions to limit the potential for security breaches.

12.    It is well known among reasonably qualified web application developers that basic security requires use of a mechanism to prevent end-users from injecting commands or material parameters into the web application by manipulating the data sent from an end-user's web browser to the application's web server.[3]

---

[2] *See, e.g.,* https://en.wikipedia.org/wiki/Solution_stack, explaining the concept of a stack and giving many examples of stacks used online.

[3] *See, e.g.,* https://www.php.net/manual/en/security.variables.php (an entry in the manual for PHP, one of the most commonly used programming languages for web applications, noting the importance of being suspicious of information sent from end-users).

13.     Over a decade ago, the U.S. Air Force published a thorough report (including programming advice) cautioning web application developers to be mindful that exposing sensitive system information from within the stack can allow unauthorized access to confidential data.  The report included a graphic illustrating how information originating from an end-user's browser can reach all the way through the stack into otherwise protected systems:[4]



*Figure 1: Example of interaction between a user and a typical Web application.*

14.     The report explained by way of example that, in a poorly designed system, an end-user can enter programming codes into a prompt for a login, and thereby obtain login credentials for a system administrator.  Id. at 2.  The example was intended to show how important it is to design web applications in a way that precludes end-users from having free access into the base of the stack.

15.     One need not read U.S. Military bulletins to receive notice of this commonly understood issue. For instance, the user manual for PHP, a widely used programming language in web application development, admonishes programmers:

"You should always carefully examine your code to make sure that any variables being submitted from a web browser are being properly checked, and ask yourself the following questions:

-     Will this script only affect the intended files?

---

[4] https://apps.dtic.mil/dtic/tr/fulltext/u2/a483186.pdf at p. 1

-   Can unusual or undesirable data be acted upon?

-   Can this script be used in unintended ways?

-   Can this be used in conjunction with other scripts in a negative manner?

-   Will any transactions be adequately logged?" [5]

16.     In contrast to the widely understood and long-standing standard of protecting sensitive data within the stack from direct access by users (who can be anywhere on the Internet), First American's web application at issue in this Complaint placed document identification codes in an open and obvious location: the web address bar in the user's web browser. By placing document identification codes in this location, First American ensured that (1) end-users could see the sensitive document identifiers; (2) end-users could request documents other than what the system intended to show them simply by changing the document identifier in the browser address window and pressing the Enter key.  In this way, First American allowed unauthorized access to PII in a way that was obvious and easy for any sophisticated end-user or identity thief to execute. [6]

17.     First American also failed to implement user-level access rights to sensitive PII documents, often referred to as a "CRUD Matrix."  It is commonly understood within the web application development community that basic of sensitive data includes restricting what records may be accessed by what persons.  Documents containing sensitive PII should only be viewable by users who have logged into an account with permission to work with the particular document at issue.  The right to access particular documents should be coded into the system, such that even if a malicious user finds a way to request an unauthorized document, the web application

---

[5] https://www.php.net/manual/en/security.variables.php

[6] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/

CLASS ACTION COMPLAINT

should detect that the document does not belong to the login/account requesting it, and refuse to display the PII. [7]

18.     Private Customer Data was compromised due to First American's acts and omissions and its failure to properly protect such information.

19.     First American could have prevented this Data Breach which was the result of its inadequate approach to data security and protection of Customer Data that it collected during the course of its business.

20.     First American disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected, failing to disclose to its customers the material fact that it did not have adequate computer systems and security practices to safeguard Customer Data, failing to take available steps to prevent and prevent the Breach, failing to monitor and timely detect the Data Breach, and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

21.     As a result of First American's actions and inactions, Plaintiff's and Class Members' Customer Data has irrevocably been exposed to criminals for misuse. Plaintiff and Class Members have suffered injuries as a direct result of the Data Breach including, but not limited to: costs associated with the detection and prevention of identity theft and unauthorized use of accounts; costs associated with time spent to address and mitigate the actual and future consequences of the Data Breach; loss of productivity and opportunities along with the inconvenience, nuisance

---

[7] *See, e.g.,* https://docs.microsoft.com/en-us/aspnet/web-forms/overview/older-versions-security/membership/user-based-authorization-cs (Microsoft systems permitted "easy" user-level authentication since at least 2008; https://pdfs.semanticscholar.org/0af1/ac690d8a9dca0ce5bc5ce4df2efcb06afb42.pdf?_ga=2.84465561.105198407.1560410431-179419798.1560410431 (2008 Article on the topic of securing data using a three-variable comparison of the user making a request, the data being accessed, and the process be attempted (i.e. create, read, update, or delete data)).

and annoyance of dealing with all issues resulting from the Data Breach; the imminent and certain impending injury resulting from the potential fraud and identity theft posed by their Customer Data being exposed; and the loss of Plaintiff's and Class Members' privacy.

22.    The injuries to Plaintiff and Class Members were directly and proximately caused by First American's failure to implement or maintain adequate data security measures for Customer Data.

23.    Plaintiff and Class Members retain a significant interest in ensuring that their PII and Customer Data, which remain in First American's possession, are protected from further breaches.

24.    Because of Defendant's conduct, Plaintiff and Class Members are now, and forever will be, at a heightened risk of identity theft and fraud.

25.    Defendant's conduct gives rise to claims for negligence, negligence per se, breach of implied contract, breach of fiduciary duty, breach of confidence, breach of privacy and unjust enrichment, violation of California's Business and Professions Code and the Consumers Legal Remedies Act.

26.    Plaintiff, individually and on behalf of similarly situated consumers, seeks to recover damages, equitable relief, injunctive relief, restitution, disgorgement, reasonable costs and attorney fees, and all other remedies this Court deems proper.

## PARTIES

27.    Plaintiff Debbie Ray is a resident of Sacramento California and engaged Defendant First American to provide title services in conjunction with the purchase of a home on or about December 15, 2018.

28.    Defendant First American Financial Corporation is a Delaware corporation headquartered at 1 First American Way, Santa Ana, California. It is a financial services company that provides title insurance, homeowners insurance, home

warranties, along with various closing and other services for lenders. The company employs 19,000 people and has revenues in excess of $6 billion annually.

## JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are hundreds of thousands and likely millions of putative class members, many of whom have a different citizenship from Defendant.

30. This Court has jurisdiction over Defendant. Defendant is headquartered in this jurisdiction and through its business operations in this District, Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

31. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District.

## STATEMENT OF FACTS

**A. *The First American Data Breach***

32. On or about May 20, 2019, Brian Krebs, a leading cybersecurity expert, was contacted by Ben Shoval, a real estate developer in Washington state, who claimed that First American's website (www.firstam.com) was leaking "tens if not hundreds of millions of records," and that "anyone who knew the URL for a valid document at the Web site could view other documents just by modifying a single digit in the link."[8]

---

[8] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/

33.     Krebs subsequently confirmed Shoval's discovery, which revealed that First American's web site had exposed approximately 885 million files, the earliest dating back more than 16 years, and critically, that the files containing customer PII could be accessed without any form of authentication or authorization.

34.     As reported on KrebsOnSecurity, "[m]any of the exposed files are records of wire transactions with bank account numbers and other information from home or property buyers and sellers . . . The title insurance agency collects all kinds of documents from both the buyer and seller, including Social Security numbers, drivers' licenses, account statements, and even internal corporate documents if you're a small business. You give them all kinds of private information and you expect that to stay private."[9]

35.     A document link shared by Shoval, which had been given to him by First American in connection with a recent real estate transaction, referenced a nine-digit record number. Shoval discovered that "[m]odifying the document number in his link by numbers in either direction yielded other peoples' records before or after the same date and time." *Id.*

36.     The documents that were improperly exposed on the First American website had been generated as early as 2003 and "[a]s of the morning of May 24, firstam.com was returning documents up to the present day, including many PDFs and post-dated forms for upcoming real estate closings." *Id.* As of May 24, 2019, in excess of 885,000,000 documents had been improperly exposed.

37.     By 2:00 p.m. Eastern on May 25, 2019, First American claimed to have disabled the site that made the records available. While it is presently unclear how

---

[9] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/

CLASS ACTION COMPLAINT

long the website remained in its promiscuous state, archived webs pages show private documents were available from the site dating back to at least March 2017.

38.     First American has not formally notified affected customers, nor provided any meaningful details about the Data Breach including the number of records potentially exposed, or how long those records were publicly available. It offered only the following terse statement in response to the Breach.

> "First American has learned of a design defect in an application that made possible unauthorized access to customer data.  At First American, security, privacy and confidentiality are of the highest priority and we are committed to protecting our customers' information. The company took immediate action to address the situation and shut down external access to the application. We are currently evaluating what effect, if any, this had on the security of customer information. We will have no further comment until our internal review is completed.

*Id.*

39.     According to the FBI, BEC scams are the most costly form of cybercrime today." *Id.* Armed with a single link to a First American document, BEC scammers would have an endless supply of very convincing phishing templates to use. A database like this also would give fraudsters a constant feed of new information about upcoming real estate financial transactions — including the email addresses, names and phone numbers of the closing agents and buyers. Sadly, as further noted by Krebs, "these types of data exposures are some of the most common yet preventable." *Id.*

## B. *Plaintiff's Experience*

40.     Plaintiff retained and paid Defendant First American for title/mortgage services in conjunction with the purchase of a home on or about December 15, 2018, paying money to or for the benefit of First American.  Having learned that her PII was leaked as alleged herein, Plaintiff is forced to mitigate her losses by, among other things, expending time investigating for any immediate signs of identity theft,

monitoring for signs of identity theft in the future (given the potential that her information may be brokered, stored, and sold for years to come on unlawful websites on the dark web), and paying for a monitoring service which she otherwise would not use, or would not use at the same level of cost and service.

41.     Plaintiff had a choice of vendors to pick among in conjunction with the purchase of her home. Plaintiff would not have used First American to provide title services for her home had she known that First American lacked adequate computer systems and data security practices to safeguard its customers' personally identifiable information from exposure.

42.     Plaintiff suffered actual in the form of damages to and diminution in the value of her Customer Data—a form of intangible property that Plaintiff entrusted to First American  for the purpose of purchasing First American's products and services which was compromised in and as a result of the Data Breach.

43.     Plaintiff suffered actual injury and damages in paying money to and purchasing products and services from First American, expenditures which she would not have made had First American disclosed that it lacked computer systems and data security practices adequate to safeguard customers' PII from theft.

44.     Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach, and has concerns for the loss of her privacy.

45.     Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII being publicly exposed.

46.     Plaintiff has a continuing interest in ensuring that her personally identifiable information, which remains in the possession of First American is protected and safeguarded from future breaches.

### C. *First American and Its Customer Data Collection Practices*

47.     At all relevant times, First American was well-aware, or reasonably should have been aware, that the Customer Data collected, maintained and stored on its computer systems is highly sensitive, susceptible to attack, and could be used for wrongful purposes by third parties, such as identity theft and fraud.

48.     First American's Privacy Policy states in relevant part:

<u>We Are Committed to Safeguarding Customer Information</u>

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

<u>Applicability</u>

This Privacy Policy governs our use of the information that you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its Fair Information Values.

<u>Types of Information</u>
Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

> Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;

> Information about your transactions with us, our affiliated companies, or others; and

> Information we receive from a consumer reporting agency.

CLASS ACTION COMPLAINT

## Former Customers

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

## Confidentiality and Security

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

## Fair Information Values

<u>Fairness</u> We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.

<u>Public Record</u> We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

<u>Use</u> We believe we should behave responsibly when we use information about a consumer in our business. We will obey the laws governing the collection, use and dissemination of data.

<u>Education</u> We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy. We will instruct our employees on our fair information values and on the responsible collection and use of data. We will encourage others in our industry to collect and use information in a responsible manner.

CLASS ACTION COMPLAINT

<u>Security</u> We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.[10]

49.     Despite multiple assurances that it would do so, First American failed to protect the integrity and privacy of Customer Data.

**D. *The Value of Customer Data***

50.     It is well known that Customer Data is highly coveted and a frequent target of hackers. Despite numerous public announcements of data breaches, First American maintained an insufficient and inadequate system to protect the Plaintiff and Class Member Customer Data. Worse yet, the exposure was not as a result of an external infiltration, but rather flawed internal mechanisms that, if working properly, could have easily prevented the exposure.

51.     A "cyber black market" exists in which criminals openly post sensitive financial information, social security numbers, and other personal information on multiple underground Internet websites. Customer Data is valuable to identity thieves because they can, among other things, use victims' personal data to open new financial accounts and take out loans in another person's name, incur charges on existing accounts, or clone ATM, debit, and credit cards.

52.     Professionals tasked with trying to stop fraud and misuse of personal financial data know that Customer Data and PII have real monetary value in part because criminals continue their efforts to obtain this data.[11] Indeed, according to the Identity Theft Resource Center, 2018 saw 1,244 data breaches, that resulted in the

---

[10] www.firstam.com/privacy-policy/index.html (last visited May 26, 2019)

[11] *Data Breaches Rise as Cybercriminals Continue to Outwit IT*, *CIO Magazine*, https://www.cio.com/article/2686167/data-breach/data-breaches-rise-as-cybercriminals-continue-to-outwit-it.html (last visited January 23, 2019).

exposure of 446,515,334 records, more than double the number of records from a year earlier.[12]

53.     Consumer PII remains a high value target to identity criminals, as evidenced by the prices criminals are willing to pay on the black market. Experian reports that a stolen credit or debit card number can sell for $5-110 on the dark web,[13] while a complete set of bank account credentials can fetch as much as a thousand dollars.[14]

**E. *First American Was Aware of Its Obligation to Protect Customer Data and the Risks Associated With A Data Breach***

54.     At all relevant times, First American knew, or reasonably should have known, of the importance of safeguarding Customer Data and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on its customers as a result of a breach.

55.     Over the last decade U.S. consumers have been plagued by a series of data breaches that have resulted in the wide spread of Consumer Data.[15]

56.     As noted above, information exposed by First American would be a "virtual gold mine" for phishers and scammers involved in Business Email

---

[12] *2017 Annual Data Breach Year-End Review,* https://www.idtheftcenter.org/2017-data-breaches, (last visited January 23, 2019).

[13] *Here's How Much Your Personal Information Is Selling for on the Dark Web* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/, (last visited January 23, 2019).

[14] *Here's How Much Thieves Make By Selling Your Personal Data Online, Business Insider,* http://www.businessinsider.com/heres-how-much-your-personal-data-costs-on-the-dark-web-2015-5, May 27, 2015.

[15] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at* https://www.idtheftcenter.org/surveys-studys/ (last visited January 23, 2019).

Compromise scams. "According to the Federal Bureau of Investigation (FBI), this scheme has already caused $12.5 billion losses to companies as of 2018. With the information provided by First American's data leak, the scam is technically simple and highly effective. Indeed 9,291 BEC attempts were recorded in the first 3 quarters of 2018, representing a 46-percent increase from the same period a year before.[16]

57.    Moreover, these types of data exposures – those resulting from an internal failure as opposed to an external attack or infiltration – are classic unforced errors and among the most common yet preventable cybersecurity events. For example, in 2018 alone, the following incidents were reported: the parent company of Kay Jewelers and Jared Jewelers revealed a weakness in their site that exposed the order information for all of their online customers;[17] Fiserv Inc. fixed a bug that exposed personal and financial details of countless customers across hundreds of bank web sites;[18] LifeLock corrected an information disclosure flaw that exposed the email address of millions of its subscribers;[19] and Panera was forced to remedy a  weakness on its website that exposed millions of customer names, email and physical addresses, birthdays and partial credit card numbers.[20]

58.    While the weakness in First American's website is hauntingly reminiscent of those leaks that predated it last year, regrettably, the extremely sensitive nature and volume of the personal information released is unsurpassed.

---

[16] https://www.trendmicro.com/vinfo/us/security/news/cybercrime-and-digital-threats/year-end-review-business-email-compromise-in-2018 (last visited May 29, 2019).

[17] https://krebsonsecurity.com/2018/12/jared-kay-jewelers-parent-fixes-data-leak/

[18] https://krebsonsecurity.com/2018/08/fiserv-flaw-exposed-customer-data-at-hundreds-of-banks/

[19] https://krebsonsecurity.com/2018/07/lifelock-bug-exposed-millions-of-customer-email-addresses/

[20] https://krebsonsecurity.com/2018/04/panerabread-com-leaks-millions-of-customer-records/

59.     Given the widespread coverage of such data exposures, the preventable of the weakness that lead to such breaches, and the significant consequences of a breach, First American was, or should have been, aware of the need to safeguard its computer systems and to ensure they maintained the privacy of the sensitive information to which it was entrusted to protect.

**F. *First American Failed to Comply With FTC Requirements***

60.     Federal and State governments have likewise established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[21]

61.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[22] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.  The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system;

---

[21] Federal Trade Commission, *Start With Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited January 23, 2019).

[22]Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited January 23, 2019).

watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

62.     The FTC also recommends that companies not maintain financial information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[23]

63.     The FTC implores companies to apply sound security practices and to continually verify that privacy and security features work. "There is no way to anticipate every threat, but some vulnerabilities are commonly known and reasonably foreseeable. In more than a dozen FTC cases, businesses failed to adequately assess their applications for well-known vulnerabilities." *Id*. at 9-10.

64.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

65.     First American's failure to safeguard PII and to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[23] FTC, *Start With Security*, *supra* note 21.

66.     Despite understanding the consequences of inadequate data security, First American failed to take measures necessary to protect the integrity of Customer Data or its network.

## G. *The First American Data Breach Caused Harm and Will Result in Additional Fraud*

67.     As a result of First American's lax standards and inadequate security protocols, consumers, including Plaintiff and Class Members, were unknowingly and unwittingly left exposed to continued misuse and ongoing risk of misuse of their personal information for years without being able to take necessary precautions to prevent imminent harm.

68.     The ramifications of First American's failure to keep Plaintiff's and Class Members' data secure are severe. Consumer victims of data breaches are much more likely to become victim of identity fraud. This conclusion is based on an analysis of four years of data that correlated each year's data breach victims with those who also reported being victims of identity fraud.[24]

69.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[25]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[26]

---

[24] 2014 LexisNexis True Cost of Fraud Study, https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf, (last visited January 23, 2019).

[25] 17 C.F.R § 248.201 (2013).

[26] *Id.*

CLASS ACTION COMPLAINT

70.     Personal identifying information is a valuable commodity to identity thieves once the information has been compromised.  As the FTC recognizes, once identity thieves have personal information, "they can drain your bank account, run up your credit cards, open new utility accounts, or get medical treatment on your health insurance."[27]

71.     Identity thieves can use personal information, such as that of Plaintiff and Class Members, which First American failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

72.     A 2016 survey of 5,028 consumers found "[t]he quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."[28]

73.     To date, First American has not substantively addressed the Breach or adequately informed its consumers. As a result of First American's failure to notify consumers of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

---

[27] Federal Trade Commission, *Warning Signs of Identity Theft*, available at: https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited January 23, 2019).

[28] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, February 1, 2017, available at https://www.javelinstrategy.com/press-release/identity-fraud-hits-record-high-154-million-us-victims-2016-16-percent-according-new (last visited January 23, 2019).

74.     Javelin Strategy and Research reports that identity thieves have stolen $112 billion in the past six years.[29]

75.     Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit.  After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[30]

76.     An independent financial services industry research study conducted for Bill Guard–a private enterprise that automates the consumer task of finding unauthorized transactions that might otherwise go undetected–calculated the average per-consumer cost of all unauthorized transactions at roughly US $215 per cardholder incurring these charges[31], some portion of which could go undetected and thus must be paid entirely out-of-pocket by consumer victims of account or identity misuse.

77.     Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result,

---

[29] *See* https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-hits-inflection-point (last visited January 23, 2019).

[30] Victims of Identity Theft, 2014 (Sept. 2015) available at: http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited January 23, 2019).

[31] Hadley Malcom, *Consumers rack up $14.3 billion in gray charges, research study commissioned for Billguard by Aite Research, USA Today* (July 25, 2013), available at: https://www.usatoday.com/story/money/personalfinance/2013/07/25/consumers-unwanted-charges-in-billions/2568645/ (last visited January 23, 2019).

studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[32]

78.     Thus, Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

## H. *Plaintiff and Class Members Suffered Damages*

79.     Customer Data belonging to the Plaintiff and Class Members is private and sensitive in nature and was left inadequately protected by First American which did not obtain consent to disclose Customer Data to any other person as required by applicable law and industry standards.

80.     The Data Breach was a direct and proximate result of First American's failure to properly safeguard and protect Plaintiff's and Class Members' Customer Data from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including First American's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Customer Data to protect against reasonably foreseeable threats to the security or integrity of such information.

81.     First American had the resources to prevent a breach. First American made significant expenditures to market its products, but neglected to adequately invest in data security, despite the growing number of well-publicized data breaches.

82.     Had First American remedied the deficiencies in its computer systems and on its website, followed FTC Guidelines and adopted security measures recommended by experts in the field, First American could have easily prevented this Breach from occurring and, ultimately, the exposure of Customer Data.

---

[32] GAO, Report to Congressional Requesters, at 29 (June 2007), available at http://www.gao.gov/new.items/d07737.pdf (last visited January 23, 2019).

CLASS ACTION COMPLAINT

83.     As a direct and proximate result of First American's wrongful actions and inaction and the resulting Data Breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives including, *inter alia,* by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports. This time has been lost forever and cannot be recaptured.

84.     First American's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class Members' Customer Data, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

    a.  theft of their personal and financial information;

    b.  the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their personal information being placed in the hands of criminals and misused via the sale of Plaintiff's and Class Members' information on the Internet's black market;

    c.  the untimely and inadequate notification of the Data Breach;

    d.  the improper disclosure of their Customer Data;

    e.  loss of privacy;

    f.  money paid for services from First American which Plaintiff and Class Members would not have expended had First American disclosed that it lacked adequate systems and procedures to reasonably safeguard customers' PII;

g.  ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

h.  ascertainable losses in the form of deprivation of the value of them for which there is a well-established national and international market; and

i.  the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

85.     Furthermore, Plaintiff and Class Members have an undeniable interest in ensuring that their Customer Data is secure, remains secure, is properly and promptly destroyed, and is not otherwise subject to further exposure, misuse or theft.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff seeks relief on behalf of herself and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of classes defined as follows:

All persons in the United States who transacted with First America Financial Corporation whose Customer Data was exposed in the Data Breach ("Nationwide Class").

87. Plaintiff seeks certification of classes defined as follows:

All persons in the state of California who transacted with First America Financial Corporation whose Customer Data was exposed in the Data Breach ("California Sub-Class").

88.     Excluded from the Classes are Defendant and any of its affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Classes; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

89.     Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

90.     The proposed Classes meet the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

91.     **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.  While the exact number of Class Members are unknown, upon information and belief, the Data Breach exposed 885 million files pertaining to hundreds of thousands and potentially millions of customers and therefore meets the numerosity requirement of 23(a)(1).

92.     **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

    a.  Whether First American had a duty to protect Customer Data;

    b.  Whether First American knew or should have known of the susceptibility of its computers systems to a data breach;

    c.  Whether First American's security measures to protect their computer systems and websites were reasonable in light of FTC

data security recommendations, and best practices recommended by data security experts;

d.  Whether First American was negligent in failing to implement reasonable and adequate security procedures and practices;

e.  Whether First American's failure to implement adequate data security measures allowed the breach to occur;

f.  Whether First American's conduct constituted unfair or deceptive trade practices;

g.  Whether First American's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of the Customer Data of Plaintiff and Class Members;

h.  Whether Plaintiff and Class Members were injured and suffered damages or other losses because of First American's failure to reasonably protect its website, computer systems and data network; and,

i.  Whether Plaintiff and Class Members are entitled to relief.

93.  **Typicality. Fed. R. Civ. P. 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other Class Members.  Plaintiff was a customer of First American and through that relationship provided Customer Data

and PII. Plaintiff's damages and injuries are akin to other Class Members, and Plaintiff seeks relief consistent with the relief sought by the Class.

94. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Classes because Plaintiff is a member of the Classes she seeks to represent; is committed to pursuing this matter against Defendant to obtain relief for the Classes; and has no conflicts of interest with the Classes. Moreover, Plaintiff's Counsel are competent and experienced in litigating class actions, including litigation of this kind. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class' interests.

95. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Classes are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

96. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through their uniform conduct,

acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive and declaratory relief appropriate to the Classes as a whole.

97. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether First American failed to timely notify the public of the Breach;

b. Whether First American owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Customer Data;

c. Whether First American's security measures to protect its computer systems were reasonable in light of FTC data security recommendations, and other best practices recommended by data security experts;

d. Whether First American's actions amounted to negligence;

e. Whether First American failed to take commercially reasonable steps to safeguard the Customer Data of Plaintiff and the Class Members; and

98. Finally, all members of the proposed Classes are readily ascertainable. Defendant has access to affected customer names and addresses. Using this information, Class members can be identified and ascertained for the purpose of providing notice.

**FIRST CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(ON BEHALF OF ALL CLASSES)**

99.   Plaintiff restates and realleges Paragraphs 1 through 98 as if fully set forth herein.

100.   Plaintiff and Class members were required to provide their personal information, to First American as a condition of receiving services from the Defendant.

101.   Implicit in the agreement between First American and its customers was First American's obligation to keep the information provided to it confidential and to maintain it securely.

102.   Defendant has an implied duty of good faith to ensure that the PII of Plaintiff and Class members in its possession were only used for purposes relevant to their interactions as customers of First American.

103.   Defendant has an implied duty to reasonably safeguard and protect the PII of Plaintiff and Class members from unauthorized disclosure or uses.

104.   Additionally, Defendant implicitly promised to retain this PII only under conditions that kept such information secure and confidential.

105.   Plaintiff and Class members fully performed their obligations under the implied contracts with First American.  First American did not.

106.   Plaintiff and Class members would not have provided their confidential PII to the Defendant in the absence of their implied contracts with Defendant.

107.   Defendant breached the implied contracts with Plaintiff and Class members by failing to reasonably safeguard and protect Plaintiff's and Class members' PII, which was compromised as a result of the Data Breach.

108.   Defendant breached its implied contracts with Plaintiff and Class members by failing to reasonably safeguard and protect Plaintiff's and Class members' PII, which was compromised as a result of the Data Breach.

109.   As a direct and proximate result of Defendant's breach of its implied contacts with Plaintiff and Class members, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity as to how their PII is used; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended; (v) the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach; (vi) the continued risk to their PII, which remain in the First American's possession and is subject to further unauthorized disclosures so long as First American fails to undertake appropriate and adequate measures to protect the PII of its customers which remain in its possession; (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class members; and (viii) the necessity to engage legal counsel and incur attorneys' fees, cost and expenses.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE**
**(ON BEHALF OF ALL CLASSES)**

110.   Plaintiff restates and realleges Paragraphs 1 through 98 as if fully set forth herein.

111.   Upon accepting and storing the Customer Data of Plaintiff and Class Members in its computer systems and on its networks, First American undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care to secure and

safeguard that information and to use commercially reasonable methods to do so. First American knew that the Customer Data was private and confidential and should be protected as private and confidential.

112.   First American owed a duty of care not to subject Plaintiff and Class Members, along with their Customer Data, to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

113.   First American owed numerous duties to Plaintiff and to Members of the Class, including the following:

      a.  to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Customer Data in its possession;

      b.  to protect Customer Data using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

      c.  to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

114.   First American also breached its duty to Plaintiff and the Class Members to adequately protect and safeguard Customer Data by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Customer Data. Furthering its dilatory practices, First American failed to provide adequate supervision and oversight of the Customer Data with which it was and is entrusted, despite the known risk and foreseeable likelihood of breach and misuse, which permitted the misuse of the Customer Data, and its disclosure to others without consent.

115.   First American knew, or should have known, of the risks inherent in collecting and storing Customer Data and the importance of adequate security.  First

American knew about numerous, well-publicized data breaches resulting from inadequate security on websites.

116.   First American knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiff's and Class Members' Customer Data.

117.   First American breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Customer Data.

118.   Because First American knew that a breach of its systems would damage hundreds of thousands, if not millions, of First American customers, including Plaintiff and Class Members, First American had a duty to adequately protect its data systems and the Customer Data contained thereon.

119.   First American had a special relationship with Plaintiff and Class Members.  Plaintiff's and Class Members' willingness to entrust First American with their Customer Data was predicated on the understanding that First American would take adequate security precautions to safeguard that information.  Moreover, only First American had the ability to protect its systems and the Customer Data stored on those systems from attack.

120.   First American's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Customer Data.  First American's misconduct included failing to: (1) secure its website and its systems, despite knowing their vulnerabilities, (2) comply with industry standard security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

121.   First American also had independent duties under state and federal laws that required First American to reasonably safeguard Plaintiff's and Class Members' Customer Data and promptly notify them about the Data Breach.

122.   First American breached its duties to Plaintiff and Class Members in numerous ways, including:

a.  by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Customer Data;

b.  by creating a foreseeable risk of harm through the misconduct previously described;

c.  by failing to implement adequate security systems, protocols and practices sufficient to protect Plaintiff's and Class Members' Customer Data;

d.  by failing to comply with industry standard data security standards during the period of the Data Breach; and

e.  by failing to timely and accurately disclose that Plaintiff's and Class Members' Customer Data had been improperly acquired or accessed.

123.   Through First American's acts and omissions described in this Complaint, including First American's failure to provide adequate security and its failure to protect Customer Data of Plaintiff and Class Members from being foreseeably captured, accessed, disseminated, stolen and misused, First American unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiff's and Class Members' Customer Data while it was within First American's possession or control.

124.   The law further imposes an affirmative duty on First American to timely disclose the unauthorized access and theft of the Customer Data to Plaintiff and the Class so that Plaintiff and Class Members can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Customer Data.

125.   First American breached its duty to notify Plaintiff and Class Members of the unauthorized access to their Customer Data by waiting to notify Plaintiff and Class Members and then by failing to provide Plaintiff and Class Members sufficient information regarding the breach

126.   To date, First American has not provided sufficient information to Plaintiff and Class Members regarding the extent of the unauthorized access to Customer Data and continues to breach its disclosure obligations to Plaintiff and the Class.

127.   Through First American's acts and omissions described in this Complaint, including First American's failure to provide adequate security and its failure to protect the Customer Data of Plaintiff and Class Members from being foreseeably captured, accessed, disseminated, stolen and misused, First American unlawfully breached its duty to use reasonable care to adequately protect and secure the Customer Data of Plaintiff and Class Members while it was within First American's possession or control.

128.   Further, through its failure to provide timely and clear notification of the Data Breach to consumers, First American prevented Plaintiff and Class Members from taking meaningful, proactive steps to secure their financial data and bank accounts.

129.   Upon information and belief, First American improperly and inadequately safeguarded Plaintiff's and Class Members' Customer Data in deviation of standard industry rules, regulations, and practices at the time of the unauthorized access. First American's failure to take proper security measures to protect sensitive Customer Data as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiff's and Class Members' Customer Data.

130.   First American's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to: failing to adequately protect the Customer Data; failing to conduct regular security audits; failing to provide adequate and appropriate supervision of persons having access to Customer Data of Plaintiff and Class Members; and failing to provide Plaintiff and Class Members with timely and sufficient notice that their sensitive Customer Data had been compromised.

131.   Neither Plaintiff, nor the other Class Members contributed to the Data Breach and subsequent misuse of their Customer Data as described in this Complaint.

132.   As a direct and proximate cause of First American's conduct, Plaintiff and the Class suffered damages including, but not limited to: damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, filing police reports, and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

### THIRD CAUSE OF ACTION
### NEGLIGENCE PER SE
### (ON BEHALF OF ALL CLASSES)

133.   Plaintiff restates and realleges Paragraphs 1 through 98 as if fully set forth herein.

134.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or

practice by businesses, such as First American, of failing to use reasonable measures to protect Customer Data.  The FTC publications and orders described above also form part of the basis of First American's duty in this regard.

135.   First American violated Section 5 of the FTC Act by failing to use reasonable measures to protect Customer Data and not complying with applicable industry standards, as described in detail herein.  First American's conduct was particularly unreasonable given the nature and amount of Customer Data it obtained and stored, and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to Plaintiff and Class Members.

136.   First American's violation of Section 5 of the FTC Act constitutes negligence *per se*.

137.   Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

138.   The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.  The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

139.   As a direct and proximate result of First American's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from identity theft including, but not limited to: damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if

not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy.

140.   Additionally, as a direct and proximate result of First American's negligence *per se*, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their Customer Data, which remain in First American's possession and is subject to further unauthorized disclosures so long as First American fail to undertake appropriate and adequate measures to protect the Customer Data in their continued possession.

## FOURTH CAUSE OF ACTION
### INVASION OF PRIVACY
### (ON BEHALF OF ALL CLASSES)

141.   Plaintiff restates and realleges paragraphs 1 through 98 above as if fully set forth herein.

142.   Plaintiff and Class Members had a legitimate expectation of privacy to their Customer Data and were entitled to the protection of this information against disclosure to unauthorized third parties.

143.   Defendant owed a duty to customers in their network, including Plaintiff and Class Members, to keep their Customer Data contained as a part thereof, confidential.

144.   Defendant failed to protect Customer Data by allowing unauthorized parties unfettered access to Plaintiff's and Class Members' Customer Data by simply entering a URL address.

145.   The unauthorized release of Customer Data including sensitive PII is highly offensive to a reasonable person.

146.   The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and Class Members disclosed their PII to Defendant as part of their use of Defendant's services, but privately with an intention that the PII would be

kept confidential and would be protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

147.   The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiff and Class Member's interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

148.   Defendant acted with a knowing state of mind when they permitted the Data Breach because they were with actual knowledge that their information security practices were inadequate and insufficient.

149.   Because Defendant acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and Class Members.

150.   As a proximate result of Defendant's acts and omissions, Plaintiff's and Class Members' Customer Data and PII was disclosed to and used by third parties without authorization, causing Plaintiff and Class Members to suffer damages.

151.   Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Class.

**FIFTH CAUSE OF ACTION**
**BREACH OF CONFIDENCE**
**(ON BEHALF OF ALL CLASSES)**

152.   Plaintiff restates and realleges paragraphs 1 through 98 above as if fully set forth herein.

153.   At all times during Plaintiff's and Class Members' interactions with Defendant, First American was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' Customer Data that Plaintiff and Class Members provided to Defendant.

154.   As alleged herein and above, Defendant's relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff's and Class Members' Customer Data and PII would be collected, stored, and protected in confidence, and would not be disclosed the unauthorized third parties.

155.   Plaintiff and Class Members provided their personal information to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the protected information and other PII to be disseminated to any unauthorized parties.

156.   Plaintiff and Class Members also provided their respective financial information to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect that protected information from unauthorized disclosure, such as following basic information security practices.

157.   Due to Defendant's failure to prevent, detect, avoid the Data Breach from occurring by, *inter alia*, following best information security practices to secure Plaintiff's and Class Members' PII, Plaintiff's and Class Members' Customer Data was disclosed and misappropriated to unauthorized third parties beyond Plaintiff's and Class Members' confidence, and without their express permission.

158.   As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiff and Class Members have suffered damages.

159.   But for Defendant's disclosure of Plaintiff's and Class Members' Customer Data and PII in violation of the parties' understanding of confidence, their Customer Data would not have been compromised. Defendant's Data Breach was the

CLASS ACTION COMPLAINT

direct and legal cause of the exposure of Plaintiff's and Class Members' PII, as well as the resulting damages.

160. The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff's and Class Members' Customer Data and PII. Defendant knew its computer systems and technologies for accepting and securing Plaintiff's and Class Members' Customer Data had numerous security vulnerabilities and Defendant failed to observe even the most basic security practices necessary to prevent unauthorized disclosure.

161. As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Customer Data and PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers/patients and former customers/patients in their continued possession; (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (viii) the diminished value of Defendant's goods and services they received.

162.   As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and Class Members have suffered and will continue to suffer injury in the form of economic and non-economic losses.

### SIXTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (ON BEHALF OF ALL CLASSES)

163.   Plaintiff restates and realleges Paragraphs 1 through 98 as if fully set forth here.

164.   Plaintiff and Class Members conferred a monetary benefit on First American.  Specifically, they purchased goods and services from First American.  In exchange, Plaintiff and Class Members should have received from First American the goods and services that were the subject of the transaction and should have been entitled to have First American protect their Customer Data with adequate data security.

165.   First American knew that Plaintiff and Class Members conferred a benefit on First American and accepted or retained that benefit. First American profited from the purchases and used the Customer Data of Plaintiff and Class Members for business purposes.

166.   First American failed to secure the Customer Data of Plaintiff and Class Members and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

167.   First American acquired the Customer Data through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

168.   If Plaintiff and Class Members had known that First American would not secure their Customer Data using adequate security, they would not have retained the services of First American nor provided it with sensitive PII.

169.   Plaintiff and Class Members have no adequate remedy at law.

170.   Under the circumstances, it would be unjust for First American to be permitted to retain any of the benefits that Plaintiff and Class Members conferred on it.

171.   Under the principles of equity and good conscience, First American should not be permitted to retain the money belonging to Plaintiff and Class Members because First American failed to implement the data management and security measures that are mandated by industry standards.

172.   First American should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, First American should be compelled to refund the amounts that Plaintiff and Class Members overpaid.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA**
**UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)**
**(ON BEHALF OF THE CALIFORNIA SUB-CLASS ONLY)**

173.   Plaintiff restates and realleges Paragraphs 1 through 98 as if fully set forth here.

174.   This claim is brought by the Plaintiff on behalf of California customers of First American.

175.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

176.   A business act or practice is "unlawful" if it violates any established state or federal law. By committing the unlawful acts and practices alleged above in Counts I-VI, First American has engaged, and continues to be engaged, in unlawful business

1   practices within the meaning of California Business and Professions Code §§ 17200,

2   et seq.

3        177.   A business act or practice is "unfair" under the Unfair Competition Law

4   if the reasons, justifications and motives of the alleged wrongdoer are outweighed by

5   the gravity of the harm to the alleged victims.

6        178.   First American has and continues to violate the "unfair" prong of the

7   UCL through its inadequate cyber security measures and protocols which led to the

8   exposure of Customer Data. The gravity of the harm to members of the Classes

9   resulting from such unfair acts and practices outweighs any conceivable reasons,

10  justifications, or motives of First American for engaging in such acts and practices. By

11  committing the acts and practices alleged above, First American has engaged, and

12  continues to engage, in unfair business practices within the meaning of California

13  Business and Professions Code §§ 17200, et seq.

14       179.   A business act or practice is "fraudulent" under the Unfair Competition

15  Law if it actually deceives or is likely to deceive members of the consuming public.

16  First American's actions in assuring the privacy its customers and the integrity of their

17  PII was deceptive in light of their lax cyber security protocols and practices.

18       180.   Each and every customer of First American was promised that their

19  personal information would be safeguarded via the company policies and disclosures

20  as alleged herein.  Communication of such promises occurred just prior to the time

21  Plaintiff and class members provided their PII to First American.  Plaintiff and class

22  members relied on First American's disclosures and policies.  Their reliance was

23  reasonable given First American's promises, ordinary consumer expectations, and

24  standard practices among institutions holding sensitive financial PII.  Plaintiff and

25  class members suffered injury and attendant damages, including loss of money, as

26  alleged herein.

27

28

181.   Through its unlawful, unfair and fraudulent acts and practices, First American has obtained, and continues to unfairly obtain, money from members of the Classes. As such, Plaintiff requests that this Court cause First American to restore this money to Plaintiff and all members of the Classes, to disgorge the profits First American made on these transactions, and to enjoin First American from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Classes may be irreparably harmed and denied an effective and complete remedy if such an order is not granted.

**EIGTH CAUSE OF ACTION**
**(VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT,**
**CALIFORNIA CIVIL CODE §§ 1750, *ET SEQ.*)**
**(ON BEHALF OF THE CALIFORNIA SUB-CLASS ONLY)**

182.   Plaintiff restates and realleges Paragraphs 1 through 98 as if fully set forth here.

183.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq*. (the "CLRA").

184.   Plaintiff and each member of the proposed Class are "consumers" within the meaning of Civil Code § 1761(d).

185.   The real-estate related services provided First American to Class Members constitute "transactions" within the meaning of Civil Code § 1761(e) and are "services" within the meaning of Civil Code § 1761(b).

186.   First American has violated, and continues to violate, the CLRA in at least the following respects:

    a.   in violation of Civil Code § 1770(a)(5), First American represented that the transaction had characteristics which it did not have;

b.  in violation of Civil Code § 1770(a)(7), First American represented that its services were of a particular standard, quality or grade, which they were not; and

c.  in violation of Civil Code § 1770(a)(9), First American advertised its services with the intent not to provide what it advertised.

187.  First American knew, or should have known, that customers would have to provide highly sensitive PII as part of their transactions and that maintaining the integrity and security of that information formed a material basis for Plaintiff and Class Members to enter into the transaction.

188.  First American carried out the conduct set forth in this Complaint willfully, wantonly, and with reckless disregard for the interests of Plaintiff and the Class, and as a result, Plaintiff and the Class have suffered an ascertainable loss of money or property.

189.  Plaintiff and the members of the Class request that this Court enjoin First America from continuing to engage in the unlawful acts and practices alleged above, pursuant to California Civil Code § 1780(a)(2). Unless First American is permanently enjoined from continuing to engage in such violations of the CLRA, consumers whose PII remain in the possession of First American will remain subject to improper exposure.

190.  Pursuant to Civil Code § 1782, Plaintiff has sent a certified letter notifying Defendant of the conduct described herein and that such conduct was in violation of particular provisions of Civil Code § 1770. The letter demands that First American repair, or otherwise rectify, problems associated with its illegal behavior which are in violation of Civil Code § 1770. Plaintiff will subsequently seek to amend the complaint pursuant to Civil Code § 1782(d).

CLASS ACTION COMPLAINT

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests the following relief:

a.     For an Order certifying the Class, as defined herein, and appointing Plaintiff and her Counsel to represent the Class.;

b.     For equitable relief enjoining First American from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Customer Data, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c.     For equitable relief compelling that First American use appropriate cyber security methods and policies with respect to consumer data collection, storage and protection and to disclose with specificity to Class Members the type of Customer Data compromised;

d.     For an award of damages, including nominal damages, as allowed by law in an amount to be determined;

e.     For an award of attorney's fees costs and litigation expenses, as allowable by law;

f.     For prejudgment interest on all amounts awarded; and

g.     Such other and further relief as this Court may deem just and proper.

CLASS ACTION COMPLAINT

# <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:    June 27, 2019

<u>/s/ *Jean Sutton Martin*</u>
Jean Sutton Martin
jeanmartin@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
2018 Eastwood Road Suite 225
Wilmington, NC 28403
Tel: (813) 559-4908
Fax: (813) 222-4795

Dated:    June 27, 2019

<u>/s/ *Joshua H. Watson*</u>
Joshua H. Watson
jwatson@justice4you.com
CLAYEO C. ARNOLD, APLC
111 W. Ocean Blvd, Fourth Floor
Long Beach, CA 90802
Tel: (562) 216-8270; (916) 777-7777
F: (916) 924-1829

CLASS ACTION COMPLAINT